Filed 10/8/13  M&M Media Group v. ACE Outdoor Advertising CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| M&M MEDIA GROUP, INC., | B242772 |
| Plaintiff, Cross-Defendant and Respondent, | (Los Angeles County Super. Ct. No. BC411585) |
| ACE OUTDOOR ADVERTISING, LLC, | |
| Cross-Defendant, Cross-Complainant and Respondent, | |
| v. | |
| REGENCY OUTDOOR ADVERTISING, INC., | |
| Defendant, Cross-Complainant, Cross-Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rita Miller, Judge.  Affirmed.

Manatt, Phelps & Phillips, Ronald Turovsky; Russ August & Kabat, Steven M. Goldberg; Horvitz & Levy, H. Thomas Watson and David M. Axelrad for Defendant, Cross-Complainant, Cross-Defendant and Appellant.

Greenberg Glusker Fields Claman & Machtinger, Lee A. Dresie and Megan F. Rivetti for Respondents M&M Media Group, Inc. and Ace Outdoor Advertising, LLC.

**INTRODUCTION**

Plaintiff M&M Media Group, Inc. (M&M) owns a building on Sunset Boulevard in West Hollywood, California, that houses the famed music venue "Whisky a Go Go" (the Whiskey). Atop the building is a billboard structure that, as relevant here, M&M leased to defendant Regency Outdoor Advertising, Inc. (Regency). When M&M terminated the lease, and entered a new lease with cross-complainant Ace Outdoor Advertising, Inc. (Ace), Regency initially refused to recognize the termination of its lease, and later asserted ownership of horizontal beams affixing the billboard structure to the roof of the Whiskey. The dispute resulted in M&M (as plaintiff) and Ace (as a cross-complainant) suing Regency for various causes of action, and Regency cross-complaining against M&M and Ace. In a court trial, M&M prevailed on its claims against Regency for breach of a lease agreement and intentional interference with business advantage, and Ace prevailed on its claims for interference with contract and prospective business advantage. The trial court awarded compensatory damages of $676,000 to M&M and $302,932.50 to Ace, and punitive damages to M&M and Ace in the same amounts.

Regency appeals from the judgment, contending that the trial court violated the litigation privilege (Civ. Code § 47, subd. (b))[1] by finding Regency liable based on legal positions Regency asserted during the parties' dispute over ownership of the billboard structure. We disagree. Regency's liability was based not on its articulated legal positions, but on its non-communicative conduct of wrongfully

---

[1]     All subsequent undesignated references to code sections are to the Civil Code.

2

holding over after the termination of the lease. Further, substantial evidence supports the trial court's finding that Regency held over. Finally, we find no error in the court's damages calculations.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Regency Lease*

Since at least the 1960s, a billboard structure has been in place atop the Whiskey. Eller Media Company, and then its successor Clear Channel, leased the pre-existing billboard structure from M&M from February 1, 1997 to June 30, 2003. On September 25, 2000, M&M signed an agreement to lease to Regency the rooftop of the Whiskey (the Regency Lease), "for the sole purpose of erecting and maintaining one (1) outdoor advertising structure" (the Structure). The Regency Lease provided that "Regency shall at all times remain the owner of the Structure and all advertising signs, supporting structures, devices, illumination facilities, connections and improvements erected or made by Regency, and . . . Regency shall have the right to remove said signs, structures and improvements at the expiration of this Agreement." The Regency Lease was to commence after the expiration of the Clear Channel lease in June 2003 and remain in force until at least December 31, 2008, and would continue for a successive term unless M&M or Regency served written notice of termination 60 days prior to December 31, 2008.

In May 2003, Regency and Clear Channel entered into a letter agreement, to which M&M consented, providing that Clear Channel would leave its sign structures, lights, supports and facings in place on the rooftop, and those items would become Regency's property.

3

On August 9, 2007, M&M sent a notice to Regency terminating the Regency Lease effective December 31, 2008. On December 20, 2007, M&M entered into a lease with Ace giving Ace the right to possession of M&M's rooftop for the purpose of billboard advertising, beginning on January 1, 2009. On October 29, 2008, M&M sent another notice to Regency confirming its termination of the Regency Lease, effective December 31, 2008.

*The Parties' Dispute and Regency's Refusal to Vacate*

Regency challenged M&M's notices of termination as inadequate under the Regency Lease provisions because they were provided *more* than 60 days prior to the end of the lease term, rather than *exactly* 60 days before. Thus, Regency took the position that its right to operate the billboards would *not* cease on December 31, 2008. M&M responded by asserting that the notice was proper, and alerting Regency to the fact that it had made other business arrangements for lease of the billboards to commence January 1, 2009.

Regency subsequently asserted that it owned horizontal wood beams that were embedded in the roof, and to which the billboard structure was attached, and stated it would not remove any of its property from the Whiskey rooftop unless it was also allowed to remove the beams. M&M would not give Regency permission to remove the beams because doing so would damage the roof and possibly compromise the structural integrity of the building, and because M&M did not believe Regency had the right to remove the beams. Because Regency refused to remove any of its property and threatened to sue if M&M removed it, Ace was unable to install billboard advertising pursuant to its lease. In April 2009, M&M contracted with Ace to dismantle and remove all parts of the billboard structure that Regency claimed to own, except the horizontal beams, and Regency subsequently picked up the parts after their removal from the roof.

4

*Ensuing Lawsuits*

M&M filed two successive unlawful detainer actions against Regency, but after multiple demurrers and iterations of the complaints, ultimately dropped the unlawful detainer cause of cause and added claims for breach of lease, trespass, intentional interference with business advantage, and declaratory relief. Regency filed a cross-complaint alleging causes of action for declaratory relief, breach of contract, forcible entry and forcible detainer, trespass, conversion, unjust enrichment, imposition of constructive trust, claim and delivery, violations of Business and Professions Code section 17200, and specific performance. Ace filed a cross-complaint against Regency alleging interference with contract and prospective business advantage.

*The Trial – Phase I*

The bench trial was conducted in two phases. Phase I, starting on September 28, 2010 and ending October 8, 2010, determined issues of liability and compensatory damages. Phase II, which was held on January 24, 2011, concerned the amount of punitive damages.

During Phase I, considerable evidence was introduced concerning communications between M&M and Regency and their respective counsel leading up to and during the litigation proceedings between the parties. Regency did not object during trial to the admission of such evidence,[2] and stipulated to the

---

[2] Regency's answer to M&M's complaint invoked the litigation privilege as an affirmative defense to the claims for trespass and intentional interference with business advantage, but not the claim for breach of lease, and Regency did not assert the litigation privilege as an affirmative defense in its answer to Ace's cross-complaint.

admissibility of, and relied upon, numerous communications between the parties relating to the prospective or actual litigation.

Evidence was thus admitted demonstrating Regency's consistent assertion that it owned the entire billboard structure as well as the underlying horizontal wood beams and would not remove any of its property from the Whiskey rooftop unless it was also allowed to remove the beams, even though such action could jeopardize the structural integrity of the building. The evidence of communications included the following: (1) a December 29, 2008 letter from Regency's counsel to M&M's counsel denying that Regency had stated that it intended to vacate the premises on or before December 31, 2008, and indicating that "Regency was considering the alternative of removing its property" but "wanted [M&M's] unequivocal acknowledgement that Regency owned the billboard structures located on the roof of the subject premises"; (2) Regency's February 2009 pleading filed in the unlawful detainer action asserting that it owned the entire billboard structure, including the supporting structures, and accusing M&M of seeking to "convert" the billboards; (3) statements in another pleading filed by Regency in April 2009 that "Regency owns the horizontal beams which support the billboards, and plaintiffs cannot 'acquire' them by interfering with Regency's removal efforts and then suing in unlawful detainer to secure Regency's property"; (4) an April 22, 2009 letter from Regency's counsel to M&M's counsel asserting that M&M had illegally dismantled and removed Regency's billboards, and that Regency had a remedy against M&M in tort for M&M's allegedly illegal self-help; (5) an April 27, 2009 letter from Regency's counsel to M&M's counsel asserting that M&M had converted Regency's property by prohibiting Regency from removing the horizontal beams and by illegally removing the signs; (6) a May 1, 2009 letter from Regency's counsel to M&M's counsel asserting that Regency owned the entirety of the sign structures and the horizontal beams and accusing

M&M of seeking "to convert and control Regency's beams"; and (7) testimony by Regency's Chief Executive Officer Brian Kennedy that he insisted on removing the horizontal beams from the roof and would not remove anything else unless he was permitted to do so.

In addition, Kennedy's testimony left little doubt that the insistence on removing the beams was intended to interfere with the lease between M&M and Ace. Kennedy testified that he knew that Regency had neither erected nor made the horizontal beams (the lease gave Regency the right to remove only items "erected or made by Regency"). He knew that removal of the beams – which he estimated would cost $50,000 or more -- would cost more than the beams were worth. Further, Regency had no plans to use the beams after their removal. According to Kennedy, M&M offered to supply Regency with brand-new horizontal beams in lieu of the ones on the rooftop, but Kennedy refused the offer because he had no use for the beams. Ultimately, after the sign structure (except for the horizontal beams) was removed and returned to Regency, Regency sold the pieces for scrap.

Kennedy insisted on removing the horizontal beams in part because they were a key part of the structure, without which "you cannot have that sign." Also, it was Regency's standard practice to remove every piece of the supporting structure when it lost a lease because of "liability issues" and "so you don't have to revisit the situation."

Ace's general manager, Andrew Bilanzich, testified that he approached Kennedy and asked if there was a sum that would resolve the dispute and give Ace access to the billboard structure. According to Bilanzich, Kennedy replied, "There is no amount of money and I'm going to make your life miserable."

7

*Tentative Statement of Decision After Phase I*

After Phase I of the trial, on October 26, 2010, the court issued a tentative decision concluding that Regency did not have the right to remove the horizontal beams at the base of the billboard structure, and finding that Regency's insistence on removing those beams constituted a breach of the lease. The decision also found that Regency did not want to relinquish the rooftop to a new billboard advertising competitor, Ace, and that Regency and its counsel took "numerous untenable positions designed to delay Ace's takeover of the rooftop as long as possible and to make it as difficult and expensive as possible for M&M and Ace." The court found that M&M had proved its claim for interference with business advantage, and that Ace had proved its claims for interference with contract and prospective business advantage.

On November 15, 2010, Regency requested a statement of decision. M&M drafted a proposed statement, to which Regency objected primarily on the ground that it violated the litigation privilege (§ 47, subd. (b)) by imposing tort liability based on Regency's assertion of defenses, contentions, and litigation positions, related to or in anticipation of litigation. In particular, Regency objected that its litigation position concerning its rights to the horizontal beams was used as a basis to impose liability.

The court invited M&M to submit a revised proposed statement of decision. M&M's January 14, 2011 revision stated that Regency's liability was premised not on its litigation conduct, but rather on its conduct amounting to a failure to surrender possession and a "wrongful holdover." Regency objected to the revised proposed statement, arguing that M&M's complaint had not alleged a holdover and that Regency's liability continued to be predicated on its litigation positions.

8

*Phase II*

Prior to the start of Phase II of the trial on January 24, 2011, Regency filed a motion in limine under section 47, subdivision (b) to exclude evidence or arguments regarding positions taken by Regency in anticipation of or during litigation, for purposes of assessing the punitive damages award. The only new evidence sought to be admitted during Phase II were records demonstrating Regency's financial condition. However, during the hearing, M&M's counsel sought to rely on evidence demonstrating Kennedy's bad faith adduced during Phase I. The court generally suggested that evidence of Regency's statements during the litigation, as opposed to conduct, was not admissible to prove punitive damages, but postponed its ruling on the issue of punitive damages and the applicability of the litigation privilege as to Phase I. The court requested briefing concerning the applicability of the litigation privilege.

*Post-Trial Submissions and Rulings*

The parties submitted briefing regarding the applicability of the litigation privilege, and at a hearing on the issue on May 5, 2011, the trial court requested additional briefing on the question whether the litigation privilege can be waived, which the parties provided.

The trial court issued a second tentative decision on June 15, 2011, concluding that Regency had held over on its lease, with the intent of making it impossible for M&M to give Ace possession. The court found that the holdover constituted a breach of the lease as well as an intentional interference with the business relationship between M&M and Ace. The court further held that it did not need to reach the issue whether Regency had waived the protections of section 47, subdivision (b), because Regency's liability was based on its conduct in holding over, not on its litigation communications. Regency filed objections to the

9

second tentative decision, objecting that its liability was still premised on its litigation conduct, and that the holdover theory was not pled in M&M's complaint. M&M then submitted a proposed final statement of decision on July 14, 2011, and Regency again asserted the same objections.

On August 18, 2011, over Regency's objection, the court granted M&M's motion to amend the complaint to conform to proof at trial to include a cause of action for wrongful holdover, finding that the cause of action was already inherent in the complaint and that the substance of the claim had been litigated at trial. Thus, the complaint was amended to add the following allegation: "Regency failed to tender or surrender possession of the leased premises on December 31, 2008 when the written lease period terminated. This was a breach of the written lease and a holdover. In addition, it was an action taken for the purpose of intentionally interfering with [the] advantageous business relationships between M&M and Ace and potential lessees of the billboard space. In addition, M&M seeks a declaration that Regency held over by failing to tender or surrender possession of the leased premises on December 31, 2008 when the written lease period terminated. Regency's holdover and failure to tender and surrender possession of the leased premises caused plaintiffs to incur damages."[3]

*Final Statement of Decision*

In its final statement of decision, filed on August 23, 2011, the court summarized its interpretation of the Regency Lease, concluding that the agreement did not give Regency the right to remove the horizontal beams from the rooftop, but gave it the right (not the duty) at the termination of the lease to remove the

---

[3]     On appeal, Regency does not challenge the court's decision to permit this amendment.

10

parts that it had "erected or made." These parts included the following small, non-structural items: (1) plaques or nameplates on the front of the billboards bearing the legend "Regency" that alerted potential advertisers to call Regency if they wanted to advertise there; (2) wood slats or panels in the facings to which the advertising was attached; (3) "possibly" some light fixtures; and (4) the actual advertisements affixed to the facings.

The court ruled that Regency's failure to remove this property did not give rise to liability for trespass, given the lack of any duty to remove it, but found that Regency had engaged in affirmative conduct amounting to a wrongful holdover of the rooftop. The court relied on Regency's failure to do or say anything to tender possession of the leased premises to M&M after the termination of the lease, and the fact that it left its property on M&M's rooftop with the intent to convey the message to M&M and Ace that it was not going to vacate possession and intended to prevent Ace from taking timely possession under its new lease. The court relied on evidence that, after receiving the termination notices from M&M, Regency signed a contract with a client for Whiskey billboard advertisements to extend two weeks past the lease termination date. Further, Regency failed to apply for municipal removal permits prior to the lease termination date. The court further found that the holdover constituted both a breach of the Regency Lease and an interference with M&M's relationship with Ace and Ace's relationships with potential and actual advertisers, because Regency's holdover made it impossible for M&M to give Ace possession of the rooftop that Ace had leased. The court stated that Regency's liability was not based on Regency's communications associated with the litigation, but rather on Regency's conduct amounting to a holdover. Because the litigation privilege therefore did not apply, the court "need not reach the issue of waiver" of the privilege. However, the court held, "[e]ven if the litigation privilege were otherwise applicable, Regency waived . . . the

11

privilege" with respect to Phase I of the trial. The court also found that Regency was estopped from raising the privilege because it had itself injected the privileged communications into Phase I of the trial.

In addition, the court ruled that the evidence demonstrated that Regency held over to prevent Ace, a new competitor, from entering the billboard market, and that Regency had a malicious and oppressive intent towards M&M and Ace. The court concluded that, "[d]isregarding all of the communications by Regency personnel that are outlined in this Statement of Decision, there was sufficiently abundant clear and convincing evidence to support an award of punitive damages based on Regency's conduct alone. If the communications were admissible by reason of a waiver of the litigation privilege or for some other reason, the content of the communications certainly would have reinforced the findings of malice, oppression and intent to cause harm to M&M and Ace and to interfere with the relationships between M&M and Ace as well as Ace and potential billboard advertisers. [¶] However, in an abundance of caution, the court has disregarded all potentially privileged communications in reaching its decision. . . . It has limited itself to Regency's non-communicative conduct and the circumstances that surrounded it."

The court awarded M&M a total of $676,000 in compensatory damages: $420,000 for lost income during the first six months of 2009, and $256,000 for expenses in removing and replacing the billboard structures that Regency refused to remove but continued to claim as its property. Punitive damages of $676,000 were also imposed. The court awarded Ace $302,932.50 in compensatory damages based on a lost profits analysis, and the same amount in punitive damages.

This timely appeal followed.

**DISCUSSION**

I. *Wrongful Holdover Theory Based on Regency's Property Left on Rooftop*

Regency challenges the trial court's determination that it wrongfully held over by leaving its nameplates, wood panels, light fixtures, and billboard advertisements in place for almost four months after the expiration of its lease of the Whiskey's rooftop.[4]  According to Regency, it did not wrongfully hold over, as a matter of law, because it did not remain in possession of the rooftop after expiration of the lease, and M&M was in exclusive control and possession of the premises when the lease ended.  However, a tenant's failure to remove equipment or other property from the leased premises at the end of the lease "may constitute a holding over which deprives the landlord of his right to possession.  [Citation.]" (*Cohen v. Superior Court* (1967) 248 Cal.App.2d 551, 554 [whether tenants' failure to remove a boiler, dryer, large counter, shelves and racks, and vapor return tank effectively deprived petitioner of possession of the premises was issue remaining to be resolved at trial].)  Here, there is no dispute that Regency left property on the rooftop that it claimed to own.  Thus, the question is whether such conduct constituted a holdover in violation of the lease.

The parties disagree as to whether the determination that a holdover occurred by virtue of Regency's failure to remove its property is a question of fact

---

**4**　　The parties correctly note that the trial court's determination that Regency was a holdover tenant was inconsistent with its determination that Regency did not trespass.  A holdover tenant is deemed a trespasser.  (*Fragomeno v. Insurance Co. of the West* (1989) 207 Cal.App.3d 822, 829 (*Fragomeno*) [failure by lessee to vacate the premises without consent renders lessee a trespasser], disapproved of on other grounds by *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 841, fn. 13; 7 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 19:46, p. 126 ["A tenant for a fixed term who remains in possession after the expiration of the original term without the consent of the landlord is a trespasser."].)  However, M&M did not file a cross-appeal and does not challenge the dismissal of the trespass claim.

or law. M&M cites California decisions holding that the determination whether a tenant has abandoned or surrendered a rental property is a question of fact, to which evidence of the tenant's intent is highly relevant. (See *Wiese v. Steinauer* (1962) 201 Cal.App.2d 651, 656 ["""Abandonment is a question of intention, to be determined only upon an investigation of all the facts and circumstances, and the trier of fact is ordinarily the exclusive judge of the existence of the elements thereof, including the cardinal element of intention."""]; *Chacon v. Litke* (2010) 181 Cal.App.4th 1234, 1252 (*Chacon*) ["'Whether in any given case there has been a surrender of leased premises by a lessee and an unqualified acceptance of possession by the lessor are primarily *questions of fact* to be determined by the trial court from the whole transaction. [Citations.]' [Citations.].")

Regency counters that the terms "abandonment" and "surrender," as used in the cases relied upon by M&M, concern the relinquishment of a leasehold prior to the end date of the lease, rather than holding over beyond the expiration of the lease. We agree,[5] but the principles of analysis – examining all the circumstances, including the tenant's intent – are equally applicable to whether the tenant's conduct after the expiration of a lease constitutes a holdover in violation of the lease. Indeed, although we have not found any California authority directly on point, other jurisdictions have held that whether a tenant's failure to remove property or fixtures constitutes a holdover is a question of fact judged by the surrounding circumstances. (See *Niagara Frontier Transp. Authority v. Euro-*

---

[5]     (See *Millikan v. American Spectrum Real Estate Services Cal., Inc.* (2004) 117 Cal.App.4th 1094, 1100 ["'[I]f a lessee of real property breaches the lease and abandons the property before the end of the term . . . , the lease terminates.'"]; § 1951.3, subd. (b) [rent must have been due and unpaid for 14 consecutive days in order for a landlord to send a notice of abandonment]; *Chacon, supra*, 181 Cal.App.4th at p. 1252 ["'Generally, a surrender of [leased] premises occurs only through the consent or agreement of the parties'" to terminate the lease].)

14

*United Corp.* (N.Y. 2003) 757 N.Y.S.2d 174, 177 [303 A.D.2d 920, 922], amended on other grounds on reargument, 763 N.Y.S.2d 786 [306 A.D.2d 952] (*Niagara*) [Whether the leaving by the tenant of property on the leased premises after expiration of the lease constitutes a holding over "'is usually a question of fact, to be determined by taking into consideration the nature of the property leased, the amount paid as rent, the value of the real property, the value of the personal property left on the leased premises, the intent with which it was left, and all other facts and circumstances surrounding the transaction.' [Citations.]"]; *Nehi Bottling Co., Inc. v. All-American Bottling Corp.* (4th Cir. 1993) 8 F.3d 157, 163 [whether tenant's leaving equipment in building rose to the level of a "holdover" was an issue of fact, not law]; *Lordae Realty Corp. v. Montefiore Med. Ctr.* (N.Y. 1996) 648 N.Y.S.2d 598 [232 A.D.2d 338]; *Canfield v. Harris & Co.* (1927) 225 N.Y.S. 709 [222 A.D. 326, 329]; *Analogic Corp. v. Rich* (Mass. 2012) 2012 WL 192192; *Beck v. Troiano* (D.C. 1958) 138 A.2d 492, 493 [whether failure to remove fixtures constituted a holding over by the tenant was a question of fact]; see also 68 Am.Jur.3d Proof of Facts 1, Landlord's Recovery of Damages for Tenant's Wrongful Holding Over of Leased Premises ["Whether a tenant's act of leaving property on the premises after expiration of the lease amounts to a holdover tenancy is a question of fact to be decided in light of the surrounding circumstances, including . . . the intent with which it was left."].)

Because the question whether Regency held over is a question of fact, we review the trial court's finding for substantial evidence. (*M&F Fishing, Inc. v. Sea–Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, 1519, fn. 12 [Where there is a statement of decision containing factual findings and conclusions of law, "we review the trial court's conclusions of law independently and its findings of fact for substantial evidence."].) "The testimony of a single witness may be sufficient to constitute substantial evidence." (*Lui v. City and County of San*

15

*Francisco* (2012) 211 Cal.App.4th 962, 969.) "The ultimate determination is whether a *reasonable* trier of fact could have found for the respondent based on the *whole* record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 (*Kuhn*).) As we explain, substantial evidence supports the trial court's decision that Regency held over.

Regency first argues that its failure to remove its property from the billboard structure did not interfere with M&M and Ace's lease. The reason: M&M could have restored its exclusive possession of the rooftop by dismantling Regency's property and storing it for Regency pursuant to sections 1993 et seq. The argument is disingenuous. Sections 1993 et seq. create an "*optional* procedure for the disposition of property that remains on the premises after a tenancy of commercial real property has terminated and the premises have been vacated by the tenant." (§ 1993.02, subd. (a), italics added.) The landlord is not required to use that procedure. The reason M&M did not pursue that option in the present case is obvious: Regency threatened to sue M&M if it removed any of Regency's property from the rooftop, and when M&M finally removed it almost four months after the expiration of the lease and made it available to Regency, Regency took the position that M&M had violated the law. Having demanded that M&M leave the property in place, Regency is hardly in a position to complain that M&M should have removed and stored the property. In any event, M&M's decision not to use the optional procedure of section 1993, et seq., does not immunize Regency from liability for its holdover and interference with M&M's lease with Ace.

Next, Regency argues that because the Regency Lease gave it the right, but not the duty, to remove its property at the end of the lease, the mere failure to remove the parts or to apply for a removal permit prior to the expiration of the lease does not amount to a holdover. Regency also notes that it was entitled to a reasonable time after termination of the lease to remove its property. (See *Clark v.*

16

*Talmadge* (1937) 23 Cal.App.2d 703, 707 ["[A] tenant who has an express agreement permitting him to remove fixtures has a larger right as to the time within which they must be removed than is the case where no such agreement exists, and . . . may remove them within a reasonable time after the expiration of his term."]; *United Pacific Ins. Co. v. Cann* (1954) 129 Cal.App.2d 272, 275 [Where the lease gives a tenant the right to remove fixtures or property at the end of his lease term, the tenant must exercise this right "within a reasonable time thereafter."].)

True enough, but this does not mean that Regency's course of conduct in leaving its property on the rooftop did not constitute a holdover, when done not with the intent to relinquish the property to M&M or remove it within a reasonable time and allow M&M to lease the structure to a new tenant, but rather with the intent to continue to occupy the premises and with the effect of interfering with M&M's right of possession and Ace's ability to begin installing billboards. (See *Niagara, supra*, 757 N.Y.S.2d at p. 177 [303 A.D.2d at p. 922] [intent with which property is left on the leased premises after the expiration of the lease, as well as all the surrounding facts and circumstances, is relevant to determine whether a holdover occurred].) As we now discuss, considerable evidence was introduced at trial demonstrating Regency's intent to continue occupying the rooftop in order to interfere with M&M and Ace's new leasing arrangement.

A. *Evidence of Regency's Intent to Hold Over*

In finding a holdover, the trial court relied on evidence that, after Regency had received notice that its lease would be terminated effective December 31, 2008, Regency signed an advertising contract with a customer for advertising on the Whiskey billboard through January 14, 2009. Based on this affirmative conduct, the court reasonably inferred that Regency planned to leave its property in place, thereby retaining control over the use of the premises, and to interfere with

17

M&M's right of possession and Ace's ability to begin installing billboards.[6] This evidence in itself constitutes substantial evidence of Regency's intent to hold over.

Moreover, other undisputed evidence introduced at trial, largely consisting of communications between M&M and Regency before and after litigation began, demonstrates Regency's intent to hold over.[7] As the trial court noted in finding that Regency acted with malice, M&M invited Regency to remove from the roof what it had erected or made, and subsequently invited it to remove everything except the horizontal beams, but Regency consistently refused to remove any of its property unless M&M also agreed to let it remove the beams. However, Regency had no legitimate reason for wanting to remove the beams, because they were merely large, weathered lengths of wood with no real value or use once they were removed. Indeed, it would have been more costly for Regency to detach and remove the beams from the roof than to replace them.[8] Although Kennedy testified

---

[6] On appeal, Regency points to trial testimony by Kennedy that Regency intended to remove the billboard advertisement under that contract by December 31, 2008, and that Regency ultimately collected no revenue under that contract. Of course, on appeal, we must infer that the trial court did not credit that testimony or did not find that it outweighed the inference of Regency's intent to hold over by signing a contract committing to display a customer's billboard advertisement for two weeks after the termination of the Regency Lease. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613 ["On review of a judgment based upon a statement of decision following a bench trial, we resolve any conflict in the evidence and reasonable inferences to be drawn from the facts in support of the determination of the trial court."].)

[7] We recognize that the statement of decision is ambiguous as to the extent to which the trial court considered these communications as evidence of such an intent. Nonetheless, because we review the entire record for substantial evidence (*Kuhn, supra,* 22 Cal.App.4th at p. 1633), regardless of whether the trial court relied on these communications, we may rely on them to the extent we are not barred from doing so by the litigation privilege (§ 47, subd. (b)), discussed further below.

[8] Although not relied upon by the trial court, the record also includes an admission by Kennedy that M&M offered to supply Regency with brand-new horizontal beams in

18

that he wanted to remove the beams to obviate unspecified "liability" issues, the court specifically found that testimony not credible. Further, when one of the Ace principals approached Kennedy and asked if there was a sum that would resolve the dispute and give Ace access to the billboard structure, Kennedy replied, "There is no amount of money and I'm going to make your life miserable." This evidence, besides supporting the trial court's finding that Regency acted with malice and oppression, also demonstrated that Regency's intent in not removing its property was to hold over and prevent Ace from erecting advertising there.

B. *Inapplicability of the Litigation Privilege*

Regency argues that the trial court could not lawfully rely on any of the above communications or testimony, because to do so amounts to basing Regency's liability on its assertion of legal positions prior to and during the litigation with M&M and Ace, in violation of the litigation privilege (§ 47, subd. (b)). We disagree. The trial court properly found Regency liable based on its course of conduct in leaving its property in place with the intent not to relinquish it, but with the intent to interfere with M&M and Ace's contractual arrangements. As we discuss below, the litigation privilege does not bar consideration of communications by Regency evidencing its intent to hold over for this purpose, regardless whether the communications were related to litigation between the parties.

"The interpretation of section 47, subdivision (b) is a pure question of law which we review independently. [Citations.]" (*Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1139-1140.) "The litigation privilege is broadly applied

---

lieu of the ones on the rooftop, but Kennedy refused the offer because he had no use for the beams.

[citation] and doubts are resolved in favor of the privilege [citation]." (*Ramalingam v. Thompson* (2007) 151 Cal.App.4th 491, 500.)

The litigation privilege "reflect[s] a legislative determination that 'witnesses should be free from the fear of protracted and costly lawsuits which otherwise might cause them either to distort their testimony or refuse to testify altogether. [Citations.]' [Citation.]" (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 642.) "A four-part test determines whether a statement is within the litigation privilege. 'To be privileged a statement must (1) be made in a judicial proceeding, (2) by litigants or other authorized participants, (3) aim to achieve the litigation's objects, and (4) have some logical connection or relation to the proceeding. [Citation.]' [Citation.]" (*Silk v. Feldman* (2012) 208 Cal.App.4th 547, 555.) "The privilege extends to 'any publication . . . that is required [citation] or permitted [citation] by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked.' [Citation.]" (*A.F. Brown Electrical Contractor, Inc. v. Rhino Electric Supply, Inc.* (2006) 137 Cal.App.4th 1118, 1126-1127.) "[T]he protective mantle of the privilege embraces not only the courtroom testimony of witnesses, but also protects prior preparatory activity leading to the witnesses' testimony." (*Gootee v. Lightner* (1990) 224 Cal.App.3d 587, 594.)

In determining whether the litigation privilege bars liability, a key issue is "whether the alleged injury arises from a communicative act or noncommunicative conduct." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1248.) Our Supreme Court has "drawn 'a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication.' [Citation.] 'As a general rule, the privilege "'applies only to communicative acts and does not privilege tortious courses of conduct.'"'"

20

[Citations.]" (*Id.* at pp. 1248-1249; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1058 (*Rusheen*) ["[T]he key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its essential nature"]; *White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 888 [holding that "even if liability cannot be founded upon a judicial communication, it can be proved by such a communication," and thus concluding that admission of a low settlement offer at trial was permissible under § 47, subd. (b), to prove breach of covenant of good faith and fair dealing and bad faith by insurance company], superseded by statute on another ground as stated in *Lee v. Fidelity National Title Ins. Co.* (2010) 188 Cal.App.4th 583, 596; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 914-915 [statements made during a judicial proceeding may be used to prove the existence of bad faith in an action against an insurer].)

In this case, the basis for Regency's liability was its "independent, non-communicative" conduct in leaving its property in place on the roof, with the intent to interfere with M&M's and Ace's ability to implement their lease agreement. (*Rusheen, supra,* 37 Cal.4th at p. 1065; see *Chacon, supra,* 181 Cal.App.4th at p. 1257 [holding that the litigation privilege did not apply to landlord's conduct in refusing to allow tenants to reoccupy the apartment after their temporary eviction and an unlawful detainer action]; cf. *Rubin v. Green* (1993) 4 Cal.4th 1187, 1196 [where plaintiff's claims were founded upon alleged misrepresentations made by a law firm in the course of discussions with potential clients over the possibility of being retained to prosecute a lawsuit as well as upon the filing of pleadings in the subsequent lawsuit, acts "were communicative in their essential nature and therefore within the privilege of section 47(b)."].) Section 47 does not bar consideration of litigation-related communications to prove that Regency's intent in leaving its property on the Whiskey was to hold over for the purpose of

21

interfering with Ace's ability to conduct its advertising business. "'The privileges of Civil Code section 47, *unlike evidentiary privileges which function by exclusion of evidence* [citation], operate as limitations upon liability.' . . . [I]t is quite clear that section 47(2) has never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding. . . .' Thus, while section 47(2) bars certain tort causes of action which are predicated on a judicial statement or publication itself, the section does not create an evidentiary privilege for such statements. Accordingly, when allegations of misconduct properly put an individual's intent at issue in a civil action, statements made during the course of a judicial proceeding may be used for evidentiary purposes in determining whether the individual acted with the requisite intent." (*Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168.)

In sum, Regency's liability was based on its non-communicative conduct of failing to remove its property with the intent of interfering with the lease between M&M and Ace, thus constituting a holdover in violation of the lease.[9] Substantial

---

[9] Regency argues that the trial court's final statement of decision finding Regency liable as holdover tenant merely masked the court's actual, improper findings, stated in the court's first tentative decision, which based liability on Regency's litigation positions. The contention is meritless. A "tentative decision does not constitute a judgment and is not binding on the court." (Cal. Rules of Court, rule 3.1590(b).) "[W]here a matter is tried to the court . . . , the trial judge has broad discretion to reopen the matter prior to final judgment, even over the objection of the litigants." (*Coit Drapery Cleaners, Inc. v. Sequoia Ins. Co.* (1993) 14 Cal.App.4th 1595, 1611.) Here, the trial court's reasoning evolved after Regency objected to the first tentative decision on the grounds that the litigation privilege applied (Regency having failed to object on such grounds during Phase I of the trial). Regency has shown no abuse of discretion in the trial court's procedure leading to the final statement of decision, and there is nothing to suggest that the court's findings in that decision were dishonest. To the contrary, as we have explained, the court's findings are supported by the evidence and do not run afoul of the litigation privilege.

evidence supports that determination, and the litigation privilege does not provide Regency with immunity.[10]


II. *Intentional Interference*

Regency asserts that M&M's and Ace's claims for interference with contract and business advantage fail because they are based on Regency's assertion of "ownership rights to the billboards," which, Regency contends, did not constitute a tort. (See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 479 ["A contracting party's . . . breach of contract . . . cannot be transmuted into tort liability by claiming that the breach detrimentally affected the promisee's business."].)

However, the trial court found that Regency had engaged in conduct amounting to a wrongful holdover, which constitutes a tort. (See *Drybread v. Chipain Chiropractic Corp.* (2007) 151 Cal.App.4th 1063, 1075 (*Drybread*) ["'If the right to recovery is based upon a civil wrong such as possession of property by a . . . holdover tenant as a resulting trespasser . . . then the right to recover possession of the property by way of the summary and statutory procedure of unlawful detainer has its inception in *tortious conduct*.'" (Italics added.)];

---

**10** Because we conclude that Regency's liability was not based on privileged communications, we need not address Regency's argument that the litigation privilege applies to breach of contract claims as well as tort claims. (See *Navellier v. Sletten* (2003) 106 Cal.App.4th 763, 773 [litigation privilege "is generally described as one that precludes liability in tort, not liability for breach of contract"].)

In addition, our conclusion that the litigation privilege is inapplicable here obviates any need to address whether Regency forfeited the right to invoke the litigation privilege by failing to object during Phase I of the trial, or was estopped from asserting the privilege because it injected the same communications into evidence at trial to support its own claims.

23

*Fragomeno, supra,* 207 Cal.App.3d at pp. 830-831.)[11]  A wrongful holdover thus may constitute a basis for a tortious interference claim.  (See *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120, 1133 ["[A tenant's] decision to hold over beyond the termination of the lease under which it had possession was made with the knowledge that such action would frustrate the legitimate contractual expectations of a specific, albeit unnamed, new lessee.  That is all it was required to know to incur liability [for tortious interference]."].)  As we have explained, the trial court's finding that Regency held over is supported by substantial evidence, and thus Regency was properly held liable in tort.

### III.    *Damages*

Regency contends that the trial court made errors in calculating both M&M's and Ace's compensatory damage awards.  The amount of damages to be awarded is a fact question, and an award of damages will not be disturbed if it is supported by substantial evidence.  (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753.)

First, Regency complains that the trial court erred in awarding M&M $240,000 to compensate it for the amount it paid Ace to dismantle and remove the existing billboard structure and build a new one.  The court found as follows:  "In its reasonable, good faith efforts to mitigate its damages and to avert possible

---

[11]    In the earlier appeal involving M&M's first unlawful detainer action against Regency based on the same set of facts as here, we held in an unpublished decision that "M&M's unlawful detainer action sounds in tort because it seeks relief for Regency's tortious holding over after expiration of the lease.  (See *Drybread, supra*, 151 Cal.App.4th at p. 1076.)" (*M&M Media Group, Inc. v. Regency Outdoor Advertising, Inc.* (2010) 2010 WL 3064379.)  The logic of that holding stands, despite the fact that M&M converted its unlawful detainer claim into a cause of action for wrongful holdover.

liability to Regency for trespass, forcible detainer, conversion and other causes of action, M&M had to bear the cost of removing and rebuilding the billboard structures that Regency was claiming to own. This was financed through a rent reduction to Ace of $20,000 per month for 12 months ($240,000). In exchange Ace agreed to perform and pay for the removal and reconstruction of the structures."

Regency argues that the $240,000 M&M paid Ace was not a reasonable mitigation cost because it was unnecessary to remove the entire structure. It argues that instead M&M should have removed only the small non-structural parts that Regency had erected or made and thus had the legal right to remove, and then permitted Ace to use the existing structure. However, at that time (spring of 2009), Regency claimed ownership of the entire structure (as well as the horizontal beams) and had threatened M&M with a claim for conversion if M&M let Ace use the existing structure. Regency acknowledges that M&M's decision to dismantle the whole billboard structure and make it available for Regency to pick up was a reaction to Regency's litigation position. Regency contends that the litigation privilege protects it from liability for damages "caused by M&M's response to Regency's assertion of its legal positions." However, Regency provides no authority for its assertion that the litigation privilege would extend so far as to protect Regency from all secondary effects of its litigation positions, including mitigation efforts by M&M in response to litigation threats by Regency. The trial court did not err in awarding compensatory damages in the amount of $240,000 for the removal and rebuilding costs.

Second, Regency contends that the trial court failed to properly offset Ace's damages award with the amount Ace received in the form of a rent reduction from M&M. No such offset was warranted. As noted above, M&M reduced Ace's rent by $20,000 a month for the 12-month period from July 2009 through June 2010, as

25

an agreed-upon means to compensate Ace for its costs to remove the existing billboard structure and construct a new one. Regency misreads the court's decision and states that the trial court "accounted" for the rent reduction Ace received during the first six months of the lease, July 1, 2009 through December 31, 2009, but failed to account for the benefit Ace received from the continued rent reduction from January 1, 2010 through June 30, 2010. However, the court did not apply an offset for the rent reduction Ace received for the period from July 1, 2009 through December 31, 2009. Rather, the court subtracted from the damages award the rent that Ace would have paid Regency from *January through June 2009* (totaling $420,000), had Regency not held over. Regency was not entitled to any offset for the $20,000 a month rent reduction Ace received as fair compensation for its work tearing down the billboard structure and building of a new one.

## DISPOSITION

The judgment is affirmed. Regency to bear costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.              SUZUKAWA, J.

26